FILED

2026 Jan-30  PM 01:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KATURA WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-590-GMB |
| | ) | |
| RED MOUNTAIN RETAIL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Katura Williams filed a complaint against her former employer Red Mountain Retail, Inc. ("RMR") alleging race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(m); race discrimination in violation of 42 U.S.C. § 1981; and interference and retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* Doc. 1. The parties consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 13. Before the court are three motions: (1) RMR's Motion for Summary Judgment on all claims stated in the complaint (Doc. 42); (2) Williams' Motion for Partial Summary Judgment on her FMLA claims (Doc. 44); and (3) Williams' Motion to Strike. Doc. 57. The motions are fully briefed. Docs. 42, 44-1, 54, 57, 58, 61, 64–66.

For the following reasons, the motion to strike (Doc. 57) is due to be granted

in part and denied in part, RMR's motion for summary judgment (Doc. 42) is due to be granted in part and denied in part, and Williams' motion for partial summary judgment (Doc. 44) is due to be denied.

## I. MOTION TO STRIKE

Under Federal Rule of Civil Procedure 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  And "the affidavit or declaration must state the basis for such personal knowledge." *Duke v. Nationstar Mortg., L.L.C.*, 893 F. Supp. 2d 1238, 1244 (N.D. Ala. 2012) (citation omitted).  "For a matter to be considered within a witness's personal knowledge, it must be 'derived from the exercise of his own senses, not from the reports of others—in other words, it must be founded on personal observation.'" *Riley v. Univ. of Ala. Health Servs. Found., P.C.*, 990 F. Supp. 2d 1177, 1187 (N.D. Ala. 2014) (quoting *United States v. Evans*, 484 F.2d 1178, 1181 (2d Cir. 1973)).  And "personal knowledge can be based on a review of relevant business files and records." *Duke*, 893 F. Supp. 2d at 1244 (citations omitted).  "District courts may disregard statements that are not based on personal knowledge or are inadequately supported." *Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc.*, 793 F. App'x 896, 902 (11th Cir. 2019) (citing *Pace v. Capobianco*, 283 F.3d 1275, 1278–80 (11th Cir. 2002)).

Williams asks the court to strike the declarations of Lane, Malone, Sellers, and Valado because they are (1) not based on personal knowledge, (2) conclusory, (3) contain speculation and non-probative opinion statements, and (4) contradictory to other evidence. Doc. 57 at 2. She asks the court to strike the declarations in their entirety, including (the court assumes) their attachments.

Sellers' declaration consists of 35 individually numbered paragraphs and 30 pages of exhibits (Doc. 43-16); Malone's declaration spans 37 individually numbered paragraphs and more than 50 pages of exhibits (Doc. 43-17); Lane's declaration contains 21 individually numbered paragraphs (Doc. 43-18); and Valado's declaration runs to 61 individually numbered paragraphs and more than 90 pages of exhibits. Doc. 43-19. Williams' motion does not address the majority of the statements within each declaration or their attachments. Instead, it lists examples of purportedly impermissible statements within certain categories (those not based on personal knowledge, conclusory, speculative, etc.). Doc. 57 at 2–7.

Although Williams makes a blanket request to strike the declarations and attachments in full, the court is not equipped (or willing) to parse the declarations line-by-line and discern Williams' arguments for striking each passage. To raise an argument properly, a litigant must support that argument with factual and legal authority. *See Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1182 (11th Cir. 2024) (observing that "it is up to the parties to formulate their arguments"); *Singh v. U.S.*

*Atty. Gen.*, 561 F.3d 1275, 1278–79 (11th Cir. 2009) (explaining that simply stating an issue exists, without further argument or discussion, constitutes an abandonment of that issue). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). Accordingly, the court refuses to strike the declarations in their entirety.

That being said, Williams is correct that some of the statements contained in the declarations are inadmissible at the summary judgment stage. For example, statements about Williams' criminal history (Doc. 43-19 at 1–2, 5; Doc. 43-17 at 2, 6) are not relevant to the motion for summary judgment—even if they may relate to RMR's after-acquired evidence affirmative defense (*see* Doc. 17 at 18) or to Williams' damages. Another example is the interspersed commentary on Williams' character. *See, e.g.*, Doc. 43-19 at 5 (characterizing Williams as "one of the most manipulative, scheming, and untrustworthy employees I have ever encountered" and mentioning "her lack of integrity, her dishonesty and her willingness to say or do whatever she deems necessary to benefit herself"); Doc. 43-17 at 3 & 6 (insinuating that Williams forged doctors' excuses and committed multiple "act[s] of injustice"). The court will not consider these or any other statements that are not admissible at the summary judgment stage. *See Atl. Specialty Ins. Co.*, 793 F. App'x at 902. According, the motion to strike is due to be granted in part and denied in part.

## II.  MOTIONS FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S.

5

at 324 (internal quotation marks omitted).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted).  The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted).  On the other hand, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

The standard for deciding cross-motions for summary judgment does not differ from the standard applied when only one party moves for summary judgment.

*Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The court must consider each motion separately, resolving all reasonable inferences against the party whose motion is under consideration. *Id*. "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation and internal quotation marks omitted).

## B.    Relevant Undisputed Facts[1]

RMR owns and operations Ashley Furniture stores in north and central Alabama. *See* Doc. 43-1 at 113; Doc. 43-19 at 1. During the relevant time, David Valadao was the Chief Executive Officer of RMR (Doc. 43-11 at 21–22) and Nancy Malone was the executive administrator in charge of human resources and payroll. Doc. 43-12 at 5. RMR operated nine or ten Ashley Furniture stores, including an outlet in Bessemer. *See* Doc. 43-11 at 17; Doc. 43-14 at 20. Each store had a store manager, at least one sales manager, and at least one retail experience manager. Doc. 43-14 at 20. In the hierarchy of authority in the stores, the district manager was the lead, then the store manager was next, and finally the retail experience manager was the "number two manager" within the store. Doc. 43-11 at 19, 26.

---

[1] In its brief in support of summary judgment, RMR includes many facts that are not relevant to the claims at issue. *See* Doc. 42 at 4–42. The court recites only the facts that are relevant and admissible at summary judgment. Some of the material facts are disputed, and the court notes those disputes where appropriate.

Retail experience managers reported directly to a sales manager. Doc. 43-1 at 113. When the store manager was absent, the sales manager and retail experience managers shared responsibility for store-level functions. Doc. 43-11 at 19.

The position of retail experience manager required "[p]rior office manager experience in a retail setting" and the "[a]bility and willingness to work evenings, weekends[,] and holidays." Doc. 43-1 at 113. Retail experience managers could be hourly or salaried. Doc. 43-1 at 113; Doc. 43-11 at 17. Whether RMR paid the retail experience managers a salary or by the hour depended on the location of the store, staffing, and business volume. Doc. 43-11 at 17–20. The retail experience managers at the larger stores were salaried, while the retail experience managers at the smaller stores were hourly employees. Doc. 43-11 at 17, 19. At the larger stores, retail experience managers worked 45 to 50 hours per week and had other employees who directly reported to them. Doc. 43-11 at 17 & 34. And while the job description was the same for all retail experience managers, their day-to-day duties depended on the store location. Doc. 43-11 at 34.

### 1. *Williams' Hiring at RMR*

Williams began her employment with RMR in May 2018. She worked at multiple Ashley Furniture locations and in different positions. Williams originally worked part-time as a cashier in the Hoover and Fultondale locations. Doc. 43-1 at 16–18, 26, 126; Doc. 43-14 at 27. Her rate of pay at that time was $10 per hour.

*See* Doc. 43-1 at 127. In March 2020, Williams transitioned from a part-time employee to a full-time employee, moved back to the Hoover store while remaining in the cashier position, and receive a pay increase to $13 per hour. Doc. 43-1 at 127.

About one month later, RMR promoted Williams to the position of retail experience manager[2] and moved her to the Bessemer outlet. Doc. 43-1 at 128. Her pay remained at $13 per hour. Doc. 43-1 at 128. At her request, Williams returned to the Fultondale location as a retail experience manager in May 2020 at the same rate of pay. Doc. 43-1 at 127. In January 2021, Williams received a merit pay raise of $2 per hour to bring her to $15 per hour. Doc. 43-1 at 129. She remained in the position of retail experience manager until her termination in July 2022. Doc. 43-1 at 129.

### 2. *Dana Morris*

In December 2019, RMR contacted a temp agency to fill a vacancy for a manager of the Bessemer outlet store. Doc. 43-14 at 27. The agency placed Dana Morris, a white woman, in the position and she became the regional experience manager at the Bessemer outlet store. Doc. 43-14 at 27. RMR paid the agency $14 per hour for Morris' time, but the record is silent as to what payment Morris actually received while she worked for RMR through the agency. Doc. 43-14 at 27.

Eventually, on December 4, 2020, RMR officially hired Morris as a salaried

---

[2] Another name for "retail experience manager" was "front office manager." Doc. 43-14 at 20, 27.

retail experience manager for the Hoover store. Doc. 43-14 at 27; *see also* Doc. 43-15 at 30.  Morris made $1,384 per pay period and RMR paid her bi-weekly. Doc. 43-15 at 30.

### 3.    The Promotion Decision

Joseph Sellers, a white man, began his employment with RMR as a retail sales associate at the Bessemer outlet in December 2019. Doc. 43-13 at 6.  When that store closed approximately one year later, Sellers transferred to the Tuscaloosa store. Doc. 43-13 at 8.  After working in Tuscaloosa for about one year, the store manager approached Sellers and asked if he "had any thoughts of moving up into upper management." Doc. 43-13 at 8.  Sellers expressed interest and began training in his new position as a selling manager.[3] Doc. 43-13 at 8.

About two or three months after assuming the selling manager position, the district manager approached Sellers and asked if he would be interested in a salaried sales manager position. Doc. 43-13 at 9–10.  Sellers agreed to the promotion even though the available position was in Fultondale and he would have to commute from Tuscaloosa. Doc. 43-13 at 10.  In early February 2022, RMR promoted Sellers to a sales manager position at the Fultondale store and switched him from an hourly employee to a salaried employee. Doc. 43-16 at 19; Doc. 43-19 at 10.

---

[3] Sellers described this position as a hybrid between a sales associate and a manager in that he still made sales on the floor but also led sales meetings and assisted the salespeople in finalizing their sales. Doc. 43-13 at 8.

A few months after this promotion, Sellers moved to the Anniston store as a sales manager. Doc. 43-16 at 2.  While there, Sellers assisted the new store manager and helped train new sales associates. Doc. 43-16 at 2.  At some point in Anniston, it appears that Sellers became the acting store manager. *See* Doc. 43-16 at 21.  Then, in July 2022, Sellers returned to the Fultondale store as the acting store manager. Doc. 43-16 at 2–3, 21.

Williams contends that she should have been promoted to the acting store manager position in Fultondale instead of Sellers.  Williams expressed interest in the Fultondale store manager position in April 2022 while there was a vacancy (Doc. 43-1 at 12) and Valadao testified that he knew Williams was interested in a promotion generally. Doc. 43-11 at 35.

### 4.    *Williams' Son's Health Issues, Leave Requests, and Absences*

According to the medical records before the court, a pediatrician diagnosed Williams' son with asthma with exacerbation in November 2019.[4] Doc 43-20 at 6. The doctor prescribed prednisone and refilled a Proair inhaler[5] to be taken every four hours, as needed. Doc. 43-20 at 6.  Williams' son returned in March 2020 complaining of a cough and wheezing. Doc. 43-20 at 6.  The pediatrician referred

---

[4] The original asthma diagnosis appears to have been earlier since the medical records show refills for an albuterol solution on October 18, 2018. Doc. 43-20 at 4.

[5] Proair is an albuterol sulfate inhaler used to "treat or prevent bronchospasm in people who have obstructive airway disease [and to treat or p]revent exercise-induced bronchospasm." https://www.proair.com/respiclick/ (last visited Jan. 29, 2026).

him to an allergy immunology specialist, who he saw in June. Doc. 43-20 at 6.  The allergist prescribed an albuterol inhaler to be used every four hours and as needed for shortness of breath or wheezing, along with a daily medication. Doc. 43-9 at 46. Williams and her son returned for a follow-up visit in August, and the doctor continued the treatment while noting that the asthma was "moderate persistent" but "well controlled." Doc. 43-9 at 50.

During the same timeframe, Williams' son developed a rash.  On May 18, 2020, Williams took him to the pediatrician, complaining of an itchy rash after playing in the yard. Doc. 43-20 at 7.  The doctor diagnosed him with dermatitis. Doc. 43-20 at 7.  A few days later, Williams called the pediatrician to report that her son had made no improvement. Doc. 43-20 at 7.  The doctor prescribed medication and diagnosed him with "acrodermatitis ([G]ianotti-Crosti syndrome)." Doc. 43-20 at 7–8.

### a.    Leave During the COVID Pandemic

On August 14, 2020, Williams emailed the Ashley Furniture benefits email address to request "12 weeks of leave under the Family Cares Act to care for [her] 7 year old son, and [her] 10 year old nephew, while they are in school during the 9 weeks of virtual learning." Doc. 43-1 at 131.  Valadao emailed Williams a blank form and instructed her to return it along with a letter from the school and a letter from her husband's employer certifying that he was an "essential employee."

Doc. 43-1 at 131–32.  After additional discussion of the letter from her husband's employer (Doc. 43-1 at 132–36), RMR permitted Williams to take paid COVID-related leave from September 1, 2020, through November 24, 2020. Doc. 43-1 at 138.

### b.    June and July 2021 Requests for Leave

On June 8, 2021, Williams emailed Malone with a question:

> I was told that I can [get] some kind of documentation on record stating that my son is ill or has symptoms that may require me to take off when he becomes sick to protect my job.  Would you know what kind of documentation I need to provide so that it's notated on my file?

Doc. 43-1 at 141.  Malone contends that she did not receive this email (Doc. 43-14 at 37–38), and Williams never received a response from Malone. Doc. 43-1 at 34.

Although she denies that she saw the email, Malone testified that she spoke with Williams about the FMLA at some point after she came back to work from COVID-related leave.[6]  Doc. 43-14 at 35–38.  Specifically, Malone recalled a conversation during which Williams called to ask about "what kind of leave or accommodations . . . we might have . . . that's paid." Doc. 43-14 at 35; *see also* Doc. 43-14 at 38.  According to Malone, Williams "was asking about different accommodations and if she could do something with her schedule and, if she takes off, can she get paid." Doc. 43-14 at 38.  Malone explained to Williams that "this is

---

[6] Malone did not recall precisely when this conversation occurred. Doc. 43-14 at 37–38.

not like, you know, when you had the COVID FMLA.  You don't get paid on that."
Doc. 43-14 at 38.  Malone told her that FMLA leave was unpaid and she would need
to use her vacation and sick time if she wanted to get paid.[7] Doc. 43-14 at 35–36 &
38.

Williams also testified that sometime after she emailed Malone, she asked Bill
Woodall, the district manager, if "he kn[e]w of a form that [she] could have on file
to protect [her] from . . . being off work with [her] kid," but he "text[ed] her back
and told [her that] he [did not] know of any form." Doc. 43-1 at 34.  She asked others
about it, but they only referred her to other people. Doc. 43-1 at 34.  Williams never
received any FMLA forms from RMR in response to her requests.

On July 28, 2021, Williams again texted Woodall about her father's surgery.
Doc. 43-9 at 35.  She said that her father was having surgery on August 5 and needed
her to visit the doctor with him to complete his paperwork. Doc. 43-9 at 35.  She
asked if she needed to bring an excuse or if there was "any exception." Doc. 43-9 at
35.  The record does not reflect a response by Woodall.

### c.    Schedule Change Request for the 2021-2022 School Year

On August 31, 2021, Williams sent a text message to Valadao and asked for
a schedule adjustment.[8] Doc. 43-19 at 71–72.  She explained that she was "having

---

[7] Williams denies that this conversation occurred or that she told Malone that she "was not interested in FMLA once I learned it was not paid leave." Doc. 58-12 at 3.

[8] At the time she sent the text message, Williams had been out since August 13 because her son tested positive for COVID. *See* Doc. 43-1 at 41; Doc. 43-19 at 70.

to find someone to take care of [her] son on the weekends" and requested to "work Monday–Friday and off on the weekends [for] the rest of the year." Doc. 43-19 at 71. Williams did not want to "have to call in because [she didn't] have anyone to care for her son" and the "team ha[d] already been going through a lot due to [her] being off." Doc. 43-19 at 72. Valadao responded that she should email the request so that he and Malone could review it. Doc. 43-19 at 73.

As directed, Williams sent an email on September 1 requesting a schedule change. She asked RMR to change her work schedule "until the end of the school year to Mondays through Fridays and off on Saturday and Sundays" because she did not "have anyone to care for her son at the moment." Doc. 43-1 at 146. In response, Malone sent Williams a Schedule Accommodation Form. Doc. 43-1 at 147–48. Williams responded that she could work from 9:00 a.m. to 5:00 p.m. and "request[ed] a schedule charge due to not having anyone to care for [her] son and nephew on the weekends. Also, school has just started and [she] want[ed] to make sure [she was] [t]here to support him with any assignment." Doc. 43-17 at 63. Malone told Williams that she needed to choose to work on "one weekend day . . . because the position requires one weekend day" and asked for an end date for the schedule accommodation request. Doc. 43-1 at 151. The record does not reflect that

RMR approved Williams' request.[9]

On November 21, 2021, Williams texted Woodall that her "son has asthma and a skin condition that may require [her] to be off work at any given moment." Doc. 43-9 at 37.  Williams explained that her son had an asthma attack in the middle of the night and continued,

> I sent an email maybe about 5 months ago asking Nancy [Malone] was it a form or something I can place on my file letting you all know that if I have to be off work at times like this. . . . [S]he told me that there was not a form of such. . . . [C]ould [I] possibly get a form stating that he has asthma like I have on file with his school[?]

Doc. 43-9 at 38.  Woodall responded that Williams would need to provide a doctor's excuse "each time [her] son had an asthma attack rather than being able to keep it on file." Doc. 43-9 at 38.

### d.    Late 2021 and 2022 Absences

It appears that Williams missed work from November 21 through the end of the month.[10] *See* Doc. 43-1 at 45–46; Doc. 43-2 at 1.  She presented RMR with a doctor's excuse for her son, noting that he was excused from school from November 21 until November 31.[11] Doc. 43-2 at 1.  Medical records indicate that Williams' son had the flu during this period. Doc. 43-17 at 19–20.  It also appears that Williams remained out of work through December 6. *See* Doc. 43-1 at 46–47.  Williams

---

[9] In fact, in January 2022, Malone approached Williams about the outstanding request. Doc. 43-2 at 5.

[10] The record does not contain Williams' time sheets from 2021.

[11] November has only 30 days.

provided RMR another doctor's excuse, showing that she went to the emergency room on November 25. Doc. 43-2 at 2.  The return-to-work date on this excuse is December 1. Doc. 43-2 at 2.  The form does not list a reason for the emergency visit and Williams recalls only that she "was having some problems." Doc. 43-1 at 46.

Williams also missed work from December 2, 2021, through December 5, 2021. *See* Doc. 43-2 at 4.  She gave RMR an excuse from a Certified Registered Nurse Practitioner at her primary care doctor's office stating that she was under the clinic's care during those days and giving a return-to-work date of December 6. Doc. 43-2 at 4.  The form does not state the reason for her absence except to say that the "patient has been tested and results are pending." Doc. 43-2 at 4.  Williams does not specifically recall this absence but believes it may have been COVID-related. Doc. 43-1 at 47.

On January 5, 2022, Malone emailed Williams, stating "We never finished discussing your request . . . . Your position requires working weekends.  Please advise.  Thank you." Doc. 43-2 at 5.  Williams responded that she "thought it was decided that [she] could have one weekend day off?" Doc. 43-2 at 5.  Malone told Williams that she was not aware that Valadao approved that request and asked if she had any documentation of his approval. Doc. 43-2 at 6.  Williams replied that it was "worked out maybe with the store managers" and that she had been told she could not be off both Saturday and Sunday but could choose between the two. Doc. 43-2

17

at 6.  She explained that she had been working Saturdays because they were busier but had been taking Sundays off. Doc. 43-2 at 6.

Williams ended her email by stating, "I'm having a hardship now and just need to focus a little bit more on my son's education." Doc. 43-2 at 6.  But because of additional help in the stores, she had "been able to be off on Sundays and Fridays. . . .  I'm not sure what the end date will be right now, I guess until the end of the year maybe.  My son will be going to the 4th grade and I have my nephew that is giving me a lot of trouble in school right now." Doc. 43-2 at 6.  Malone forwarded the information to Valadao, who requested that Williams identify the specific days she could work as well as an end date for the proposed arrangement. Doc. 43-2 at 7–8.  The record is silent as to whether Williams provided RMR with the requested information and how RMR resolved her request. *See* Doc. 43-2 at 8.

That being said, RMR generally scheduled Williams to work on Saturdays in 2022 and gave her Fridays and Sundays off. *See* Doc. 43-2 at 43 (stating that "Friday and Sunday are your days off again"); Doc. 43-2 at 10 (stating she did not have work on Friday and Sunday).  However, the court cannot find any affirmative evidence confirming this assertion.  Neither party identifies any direct evidence of Williams' work schedule in 2022 in the voluminous record before the court.

As best the court can tell, the record contains the following information about Williams' absences in February and April relating to her or her son's illnesses:

18

- Williams was not scheduled to work on February 4 and 6. But she called in on Saturday, February 5, stating that her son did not feel well, and again on Monday, February 7, stating that she did not feel well. Doc. 43-2 at 10.

- There is a doctor's note from an apparent visit to the emergency room for Williams' son's asthma on Sunday, February 13. Doc. 43-9 at 70. The record does not reflect whether RMR had scheduled Williams to work that day. Doc. 43-9 at 13–14.

- On Friday, April 15, Williams missed work for a court date and also did not come to work on Saturday, April 16, stating that her son did not feel well. Doc. 43-9 at 72. Williams provided RMR with a doctor's note excusing him from school on April 15 and Monday, April 18. Doc. 43-2 at 12. But the note also gave a return-to-school date of April 25. Doc. 43-2 at 12. The notes related to the visit list the chief complaint as "asthma concern" with "mild wheezing." Doc. 43-2 at 78. The doctor diagnosed Williams' son with asthma and allergic rhinitis. Doc. 43-2 at 79. Williams worked the week of April 18 through April 22 but did not work the following weekend. Doc. 43-9 at 90–91.

- On Saturday, April 30, Williams texted that "she was throwing up and wouldn't be in today." Doc. 43-2 at 13. She was not scheduled to work that Friday or the Sunday of that weekend. Doc. 43-2 at 13. RMR asked her for a doctor's excuse, but Williams explained that she did not visit a doctor. Doc. 43-2 at 14.

### 5.    *Discipline and Termination*

After Williams missed work every Saturday in April (*see* Doc. 43-9 at 90–91), RMR began documenting her attendance issues in earnest in May 2022. RMR scheduled Williams to work on Saturday, May 7, but she did not show up. *See* Doc. 43-2 at 16. Instead, she texted her sales manager, Steven Lane, more than an hour after she was scheduled to be at work to notify him that she would not be working that day. Doc. 43-2 at 16. Lane emailed Malone and the store manager, Vance

Adock, that Williams "sen[t] [him] a text message that she could not make it because her husband and son had to work, and she could not bring her other children to work." Doc. 43-2 at 16.  Williams maintains she requested to be off that day, but "forgot to mention it." Doc. 43-2 at 16.  Adock did not recall a request. Doc. 43-2 at 16.

On May 13, RMR disciplined Williams for violating the attendance policy on May 7. Doc. 43-2 at 17.  This was Williams' first written warning, and it explained that she "has missed several Saturdays in a row, but with no call in two hours prior to the start of shift and no doctor's excuse." Doc. 43-2 at 17.  Williams signed the discipline form.[12] Doc. 43-2 at 17.

A few weeks later, Williams asked the regional manager, Roland Perrelli, if she could be off work on Saturday, June 4, for her mother's memorial service. Doc. 43-1 at 57–58.  Perrelli asked her to send the request in writing, but Williams forgot to do so at the time of their conversation. Doc. 43-1 at 58; *see also* Doc. 43-2 at 28.  Instead, on May 30, Williams placed the request for leave on June 4, and RMR initially denied it. Doc. 43-1 at 58; *see also* Doc. 43-2 at 24.  Williams texted Perrelli about the denial, and he permitted her to take off work. Doc. 43-2 at 28–32.

_____

[12] Despite signing the form, Williams emailed Valadao and Malone and, among other things, complained that Adcock would not let her use vacation time for her absence since she did not have anyone to watch her son. Doc. 43-2 at 19.  Malone responded that Williams could not use vacation time in the manner requested: "You can not put in for vacation time when you miss a shift and send a text without calling in and following the proper call in procedure as per the Employee Handbook." Doc. 43-12 at 20.

Perelli, however, reminded Williams that she must use the proper procedure to request to be absent in the future. Doc. 43-2 at 32.

On Monday, June 6, Perelli sent an email to Valadao and Malone with screenshots of his text messages with Williams about her request to miss work on the previous Saturday. Doc. 43-2 at 26–32.  He also included a list of ten dates Williams had been absent or late without a valid excuse between April 30 and May 29, 2022. Doc. 43-2 at 33.  Perelli added that RMR also needed to "address her working on her own schedule as she came in extremely early" on four days during the same timeframe. Doc. 43-2 at 33.

On June 8, Perilli met with Williams via Zoom and gave her a second written warning for violating company policies.[13] Doc. 43-2 at 34.  The warning noted her excessive tardiness and her failure to follow the proper procedures in her request to be off work on June 4. Doc. 43-2 at 34.  In the section for corrective action/specific improvement goals, the warning stated that Williams must follow RMR's policies and procedures when requesting leave and must comply with attendance policies. Doc. 43-2 at 34.  It warned that "[c]ontinuous violations of our attendance policy and call in procedure [would] lead to further disciplinary action up to termination." Doc. 43-2 at 34.

On June 16, Williams emailed a performance review of herself to Valadao

---

[13] RMR made a video recording of this meeting. *See* Doc. 50.

and Malone and stated that "Joe [Sellers] has agreed to sign my performance review."[14] Doc. 43-9 at 111.  Williams completed part of the form on her own, and then Sellers "took over" and completed the rest. Doc. 43-9 at 23.  The performance review is for the two-week time period of June 1, 2022, through June 16, 2022, and rates Williams as "excellent" in (1) job knowledge; (2) work quality; (3) initiative, teamwork, reliability; (4) communication/listening skills; (5) dependability; (6) organization; (7) customer service; and (8) job performance. Doc. 43-10 at 1. The review marked attendance as "satisfactory" and noted "I am currently trying to get my personal life in order to become better." Doc. 43-10 at 1.

Williams' absences continued during late June and early July.  Williams took a paid sick day on Wednesday, June 22. Doc. 43-9 at 92.  Sellers texted Williams to check on her but did not receive a response until early the next morning. Doc. 43-16 at 34–35.  Williams texted Sellers that she "wasn't able to move yesterday" because she "took some pain meds" and was in bed all day but she felt better and would be into work later that morning. Doc. 43-16 at 35.  But then on Friday, June 24, at about 5:00 p.m., Williams texted Sellers that she had a stomach bug and would not be able to work the next day, Saturday, June 25.[15] Doc. 43-16 at 35.  Williams testified that

---

[14] RMR maintains that this document does not paint an accurate picture of Willams' performance. Sellers testified that he should not have completed the form for Williams and admitted that Valadao disciplined him "for overstepping [his] authority." Doc. 43-16 at 5.
[15] Again, it appears that RMR did not schedule Williams to work on Friday, June 24, so she was off work on the day when she texted Sellers.

she went to the emergency room on June 25 for her stomach virus and the doctor there told her to see her OB/GYN for a separate, gynecological issue. Doc. 43-1 at 62; Doc. 43-9 at 16. Williams returned to work on June 27 and June 28, as scheduled. Doc. 43-9 at 92.

Williams did not show up for work on Wednesday, June 29, and it appears she did not notify anyone at RMR. Sellers sent Williams a text message the morning of June 30, and Williams replied that her "phone was off and she couldn't call" on June 29 but her doctor "ha[d] her off until Tuesday," July 5. Doc. 43-16 at 37. Sellers asked her to send a copy of the doctor's note and told her that he would "be expecting [her] tomorrow or it will be an unexcused absence" unless he received the note. Doc. 43-16 at 37. On July 1, Williams provided RMR with a doctor's excuse from her OB/GYN stating that the doctor treated Williams on June 29 and listing a return-to-work date of July 5. Doc. 43-2 at 40.

The time records show RMR counted Williams' time off for June 30, July 1, July 2, and July 4 as paid sick leave.[16] Doc. 43-9 at 92. Williams did not work on Tuesday, July 5 (Doc. 43-1 at 72)—the return-to-work date on her doctors' excuse—because she "was still feeling bad." Doc. 43-1 at 64. Instead, she returned on Wednesday, July 6.[17] Doc. 43-9 at 92. The record does not reflect whether Williams

---

[16] July 3 was a Sunday, and it appears Williams had that day off. It does not appear that RMR paid Williams for June 29. Doc. 43-9 at 92.

[17] Williams also did not work Friday, July 8, and Sunday, July 10, because those were her normal days off. *See* Doc. 43-2 at 43. According to the time records, Williams returned to work on July

was scheduled to work on Thursday, July 7, but RMR's time records do not show that Williams worked that day. *See* Doc. 43-9 at 92.

On July 1, while she was out on sick leave, Williams texted Sellers that she "need[ed] to be off July 9th." Doc. 43-2 at 42; Doc. 43-16 at 37. Sellers did not respond to this request. *See* Doc. 43-16. Then, on Friday, July 8, Valadao emailed Williams and told her that he did not authorize her request for leave and she needed to be at work the following day, Saturday, July 9. Doc. 43-2 at 43. He explained that "Saturday is a regular scheduled day" and "Friday and Sunday are your days off again after the holiday." Doc. 43-2 at 43. Valadao emphasized that he did not approve for her to take off and that she had "not officially requested the day off as outlined in the handbook." Doc. 43-2 at 43. He ended with the statement that Williams was "expected to be at work tomorrow for [her] regular shift." Doc. 43-2 at 43.

Williams did not, however, work on July 9. Instead, she sent a text message to Sellers:

> Hey Joe! I have been sick . . . I passed out from my procedure . . . I tried to get my dad to call you . . . but he couldn't figure out how to get your number out of my phone. I know you haven't text me . . . but I wanted to remind you that I wanted to be off work today . . . due to a[] personal issue. I will be back on Monday! Please don't forget that I put my time in.

---

11. Doc. 43-9 at 92.

Doc. 43-2 at 45 (ellipses in original).  Sellers did not respond to this text message.
Doc. 43-16 at 39.

Williams worked Monday and Tuesday, July 11 and 12. Doc. 43-9 at 92.  She
took her son to the doctor that Monday for an itchy rash. Doc. 43-2 at 79.  The doctor
noted he had a similar rash two years before and a history of eczema, diagnosed the
rash as Gianotti-Crosti syndrome, and prescribed medication. Doc. 43-2 at 79.
Williams took her son to the emergency room for the same rash on Tuesday night,
where he again received a diagnosis of Gianotti-Crosti syndrome due to an unknown
virus. Doc. 43-2 at 47.  The emergency room notes show her son was discharged at
2:23 a.m. on Wednesday morning, while the caregiver excuse indicates return status
as "may return now" and restrictions to "activity as tolerated." Doc. 43-2 at 46.

Williams did not come to work on Wednesday, July 13. Doc. 43-9 at 92.  On
Thursday, July 14, Williams texted Sellers that she was "running late" because she
was "[w]aiting on my son's aunt to come get him."[18] Doc. 43-2 at 49.  Sometime
after Williams arrived at work, Valadao and Malone held a Zoom meeting with
Williams. *See* Doc. 50.[19]  Sellers also attended the meeting. Doc. 50.  Valadao began
the meeting by discussing each of Williams' recent unexcused absences. Doc. 50 at
0:40–5:35.  Williams explained that she missed work on June 25 and July 5 due to

---

[18] RMR scheduled Williams to begin work at 9:30 a.m., but Williams did not clock in until 10:52
a.m. Doc. 43-9 at 92.
[19] The court cites here to the conventional filing by RMR.  The conventional filing contains two
videos: one of the May 13 discipline meeting and one of the termination meeting.

her own illness and offered to get a doctor's note to substantiate this claim. Doc. 50 at 0:40–5:35.  She also said, "David, I came to you and I talked to you about what's going on with me.  Now, I'm sick, I'm sick right now, but my son is also sick.  Also I'm going through a divorce.  So I don't have any support for my son." Doc. 50 at 5:35–5:48.  Valadao responded, "I understand, I understand everything that's going on on the outside, but I have a business to run." Doc. 50 at 5:54–6:00.

When Valadao asked about her tardiness for that day, Williams explained her personal life and living situation and said that she had to wait for her son's aunt to pick him up before she could leave for work. Doc. 50 at 6:00–6:50.  She said that she was "doing what [she] could do" under the circumstances. Doc. 50 at 7:02–7:05. She also referenced her son's rash as one of the reasons she missed work and did not notify anyone at RMR. Doc. 50 at 7:09–7:17.  She admitted that she understood she was causing a problem at work but said that was why she came to Valadao and Sellers to explain what was going on. Doc. 50 at 7:17–8:07.

Valadao again told Williams that he understood her situation, but maintained that other managers were working seven days per week and on their days off because they did not know whether she was going to show up for work or not. Doc. 50 at 8:08–8:38.  Valadao stated that he "can't run the business that way." Doc. 50 at 8:35–8:38.  Williams reiterated that she was not "just not coming in" (Doc. 50 at 8:38–8:41), but Valadao explained that "there is nobody in this company that gets

26

three Saturdays off in a row . . . You took Saturday off, the 25th, you were under a doctor's care on Saturday the 2nd, then you took Saturday off the 9th without getting it approved, and then yesterday you didn't come into work, is that correct?" Doc. 50 at 8:42–9:00.  Williams responded that her son was sick on the 13th, and she went to the emergency room with him. Doc. 50 at 9:00–9:08.

Malone emphasized that it was not the individual absences that were problematic so much as the "excessiveness." Doc. 50 at 9:08–9:26.  And although Malone understood that Williams had some personal challenges, it was not productive for the company to continue to employ her after her recent pattern of unacceptable behavior. Doc. 50 at 9:26–9:42 & 11:38–12:07.  Williams again offered that her son had been sick, and she was "going through something herself." Doc. 50 at 12:08–12:25.  Valadao expressed sympathy for her situation but told her that her employment was terminated, effective immediately, "based on all [her] unapproved time off and tardiness." Doc. 50 at 12:32–12:45.

At the end of the meeting, Sellers gave Williams her termination notice.  The document listed the reasons for the termination: (1) her violation of the attendance policy on May 13; (2) her violation of the attendance policy on June 8; (3) her four unexcused absences on June 25, July 5, July 9, and July 13; and (4) her seven tardies during the same timeframe. Doc. 43-2 at 51.  The termination notice explained that under the provisions of the employee handbook "[after] 2 absences or tardies in a

twelve-month rolling period, disciplinary action will be taken for each absence thereafter up to and including termination." Doc. 43-2 at 51. It also referenced the call-in procedure, which required employees to call at least two hours before a shift if they were going to be absent or tardy and provided that a failure to follow the proper call-in procedure could result in disciplinary action, including termination. Doc. 43-2 at 51. The termination notice concluded by stating, "Over the past 12 months, you missed 5 days of work [a]long with excessive tardiness. Based on the following information we are terminating your employment with Red Mountain Retail effective immediately." Doc. 43-2 at 51.

## C.    Discussion

Williams states the following claims against RMR: (1) race discrimination in violation of Title VII and § 1981; (2) gender discrimination in violation of Title VII; (3) interference and retaliation in violation of the FMLA. Doc. 1 at 7–15. RMR moves for summary judgment on all claims (Doc. 42), and Williams moves for summary judgment on her FMLA claims. Doc. 44.

### 1.    *Race and Gender Discrimination*

Williams' first five causes of action allege intentional race and gender discrimination in violation of Title VII and Section 1981. Doc. 1 at 7–12. The elements of race discrimination claims under Title VII and § 1981 are the same and therefore need not be analyzed separately. *See Hornsby-Culpepper v. Ware*, 906

F.3d 1302, 1312 n.6 (11th Cir. 2018). To survive summary judgment, "a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." *Lewis v. City of Union City, Ga*., 918 F.3d 1213, 1220 (11th Cir. 2019). A plaintiff can do this by presenting direct or circumstantial evidence of discriminatory intent. *See Ismael v. Roundtree*, __ F.4th __, 2025 WL 3492930, at *4–5 (11th Cir. Dec. 5, 2025); *Jefferson v. Sewon Am., Inc*., 891 F.3d 911, 921–22 (11th Cir. 2018).

Williams does not contend that she has direct evidence of race or gender discrimination. Instead, she uses circumstantial evidence and the *McDonell Douglas* framework in the analysis of her claims.[20] Doc. 58 at 56–62. The Eleventh Circuit recently explained the "roadmap" a court should follow "depending on whether the plaintiff can demonstrate a *prima facie* case or not." *Ismael*, 2025 WL 3492930, at *8. "If the plaintiff can establish a *prima facie* case, she is entitled to a rebuttable presumption of illicit intent." *Id*. The defendant then must "come forth with evidence and successfully rebut the presumption." *Id*. If it does this,[21] the court then "proceed[s] to ask whether 'the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow

---

[20] Williams references the convincing mosaic standard (Doc. 58 at 31–33), but she does not discuss how her claims fit within this method of proof. *See* Doc. 58 at 56–62.

[21] "[I]f the defendant fails to proffer evidence of a legitimate reason for the adverse employment action, summary judgment in favor of the plaintiff is appropriate." *Ismael*, 2025 WL 3492930, at *8.

a jury to infer intentional discrimination . . . by the decisionmaker.'" *Id*. (quoting *Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011)).  "A showing of pretext[22] (or lack thereof) would certainly be relevant.  But a plaintiff's inability to disprove the defendant's rational cannot be the sole grounds for summary judgment." *Id*. (footnote added).

A plaintiff "does not automatically lose on summary judgment" if she cannot establish a *prima facie* case. *Id*. at *9.  "Rather than lose by default, the consequence is that the plaintiff must produce enough evidence, on her own and without any helpful evidentiary burdens or presumptions, to demonstrate a material issue of triable fact.  A court, therefore, should advance directly to the convincing mosaic inquiry." *Id*.   Regardless of the method of proof, "the ultimate question in a discrimination case is whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination." *Tynes v. Fla. Dept. of Juv. Just*., 88 F.4th 939, 941 (11th Cir. 2023).

### a.    Pay Discrimination—Race

Williams alleges that RMR discriminated against her because of her race in setting her pay.  Both parties use the *McDonnell Douglas* framework in their discussion of this claim (Doc 42 at 43–49; Doc. 58 at 56–59), so the court does the

---

[22] "To show pretext, a plaintiff must show '*both* that the [employer's] reason was false, and that discrimination was the real reason' for the adverse action." *Id*. at *5 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

same.

"To establish a *prima facie* case of discrimination regarding pay, a plaintiff may prove that "(1) she belongs to a racial minority; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage." *Sumerlin v. AmSouth Bank*, 242 F. App'x 687, 690 (11th Cir. 2007) (citation omitted). Williams contends that RMR paid her less than Dana Morris, a white female employee, when they both worked as retail experience managers. Doc. 43-1 at 8–9. RMR does not dispute most of the elements of Williams' *prima facie* case but does contend that Morris is not similarly situated to Williams. Doc. 42 at 41–46.

Discrimination "is the act of treating like cases differently." *Lewis*, 918 F.3d at 1225 (citation omitted). But while Title VII expressly requires similarity, the Eleventh Circuit has "repeated[ly] reassure[ed] that 'comparators need not be the plaintiff's doppelgangers.'" *Id*. at 1226 ("[D]oppelgangers are like unicorns—they don't exist.") (quoting *Flowers v. Troup County*, 803 F.3d 1327, 1340 (11th Cir. 2015)). In other words, "exact correlation is neither likely nor necessary." *Id*. (citation omitted). Although deciding sufficient similarity requires a case-by-case assessment, the Eleventh Circuit has identified relevant "guideposts." *Id*. at 1227.

Generally, similarities that are typical of valid comparators include, but are not limited to: (1) "engage[ment] in the same basic conduct (or misconduct)";

31

(2) subjection to "the jurisdiction of the same supervisor"; (3) governance by "the same employment policy, guideline, or rule"; and (4) shared "employment or disciplinary history." *Id*. at 1227–28 (citations omitted). This standard is not formalistic—a plaintiff and her comparator need not share job titles. *Id*. at 1227. "The relevant inquiry is . . . whether the employer subjected them to different employment policies." *Lathem v. Dept. of Children & Youth Servs*., 172 F.3d 786, 793 (11th Cir. 1999).

Here, there is no evidence before the court that Williams and Morris are similarly situated in all material respects. In fact, Williams does not address this element of her *prima facie* case with any substantive argument. Doc. 58 at 57–58. She merely assumes—without citation to any evidence—that Morris is a suitable comparator such that the burden shifts to RMR. *See* Doc. 58 at 57. This is not how the *prima facie* case works. "In order to defeat summary judgment, a Title VII plaintiff proceeding under *McDonnell Douglas* must prove, as a preliminary matter . . . that she was treated less favorably than 'similarly situated' individuals outside her class." *Lewis*, 918 F.3d at 1224. It is the "plaintiff [who] must show that she and her comparators are 'similarly situated in all material respects." *Id*. Williams has done nothing more than perfunctorily allege that Morris meets the comparator standard. *See* Doc. 58 at 57. This will not suffice. In the context of summary judgment, "conclusory allegations without specific supporting facts have no

32

probative value." *United States v. Trainor*, 376 F.3d 1325, 1334 n.5 (11th Cir. 2004) (citing *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000)). Accordingly, Williams has not established a *prima facie* case of race discrimination in her pay.

But this failure does not necessarily result in summary judgment. *Ismael*, 2025 WL 3492930, at *9. Instead, Williams now "must produce enough evidence, on her own and without any helpful burdens or presumptions, to demonstrate a material issue of triable fact" of discriminatory intent regarding the pay differential. *Id*. She has not done so. Williams does not point to any evidence that race was the reason she received less pay. She spends much of her energy on whether Morris received overtime and the actual hours she worked. Doc. 58 at 58–59. While the court agrees that the record is anything but clear on this issue, this is not evidence that RMR paid Williams less than Morris because of her race. Instead, in the court's estimation Williams' only evidence of discriminatory intent is the fact that she is Black and Morris is white. "This fact alone does not create an inference, much less a convincing mosaic, of discrimination." *Sanders v. Mercedes-Benz U.S. Intl., Inc*. 2019 WL 330145, at *5 (N.D. Ala. Jan. 25, 2019); *see also Wu v. Southeast-Atl. Bev. Corp.*, 321 F. Supp. 2d 1317, 1334 (N.D. Ga. 2004 ("Plaintiff has no other evidence of discriminatory intent other than the fact that Doran is white and plaintiff is Asian.").

33

In sum, Williams has not produced any evidence from which a reasonable juror could infer that race was the reason for any differential in pay between her and Morris. Summary judgment therefore is due to be granted on her pay discrimination claim.

### b.    Promotion—Race and Gender

Williams contends that she suffered race and gender discrimination when she was not selected for a store manager position because RMR promoted Joseph Sellers, a white man. Doc. 43-1 at 8; Doc. 50 at 59–62. Both parties again use the *McDonnell Douglas* framework in their discussion of these claims (Doc. 42 at 49–52; Doc. 58 at 59–62), so the court does the same.

Williams' *prima facie* case has four elements: (1) she is a member of a protected class; (2) she applied for, and was qualified to fill, a position for which the defendant was accepting applications; (3) she did not receive the position despite her qualifications; and (4) after her rejection, the employer either kept the position open or filled it with a person outside of plaintiff's protected class. *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005); *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002); *Taylor v. Runyon*, 175 F.3d 861 (11th Cir. 1999). Williams does not need to introduce evidence of the relative qualifications of the promoted person in her *prima facie* case. *Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998).

Williams was a member of both protected classes and RMR filled the position with someone outside Williams' protected class.  Williams did not officially apply for the position, but there was no formal application process or notice of the job's availability.  When "there is no formal notice of the job's availability . . . an employer . . . has a duty to consider all those who might reasonably be interested." *Jones v. Firestone Tire & Rubber Co., Inc.*, 977 F.2d 527, 533 (11th Cir. 1992) (internal citations and quotations omitted).  Here, the record establishes only that RMR promoted Sellers (Doc. 43-16 at 2–3, 21); there is no evidence about how this promotion came about.  But Williams testified that she expressed interest in the Fultondale store manager position in April 2022 while there was a vacancy (Doc. 43-1 at 12), and Valadao testified that he knew Williams was interested in a promotion. Doc. 43-11 at 35.  This evidence is sufficient at the summary judgment stage.

RMR contends, however, that Williams cannot establish a *prima facie* case because she was not qualified for the position of store manager.  The court agrees. To be promoted to a store manager position, an RMR employee first must hold the position of sales manager. *See* Doc. 43-18 at 2; Doc. 43-19 at 4.  It is undisputed that Williams had never been a sales manager at the time of the promotion decision. Sellers, on the other hand, had worked as a selling sales manager, sales manager, and acting store manager before being transferred to the position of acting store

manager in Fultondale.  And while Williams argues that she performed store manager duties "on an as-needed basis" (Doc. 58 at 61), performing *ad hoc* duties is not the same thing as holding the position of sales manager, as RMR required before a promotion to store manager.  Williams thus cannot establish that she was qualified for the store manager position given to Sellers.  Her *prima facie* case fails.

This failure, however, does not necessarily result in summary judgment. *Ismael*, 2025 WL 3492930, at *9.  Now, however, Williams "must produce enough evidence, on her own and without any helpful burdens or presumptions, to demonstrate a material issue of triable fact" of discriminatory intent. *Id*.  She has not done so.  In fact, Williams does not cite to any evidence that race or gender played any role in the promotion decision.  Instead, she highlights RMR's "shifting reasons for not hiring her for the position of store manager," and its decision to "simply give [Sellers] the job without applying." Doc. 58 at 62.  These arguments may undermine RMR's proffered reasons, but they do not "present a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Smith*, 644 F.3d 1328.  Looking at the entire evidentiary picture, Williams has failed to produce evidence of discriminatory intent in the promotion decision.  Summary judgment is due to be granted on her promotion claim.

## 2.    *FMLA Claims*

Congress enacted the FMLA "to balance the demands of the workplace with

the needs of families, . . . [and] to entitle [eligible] employees to take reasonable leave for [certain] medical reasons." 29 U.S.C. § 2601.  The FMLA guarantees eligible employees the right to take up to 12 weeks of unpaid leave annually for any one or more of several reasons, including "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).  An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided for under the FMLA, nor may an employer "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. §§ 2615(a)(1) and (2).

The FMLA "creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Strickland v. Water Works*, 239 F.3d 1199, 1206 (11th Cir. 2001) (citing 29 U.S.C. §§ 2615(a)(1), (2)).  Both causes of action require the employee to prove that she qualified for FMLA leave. *Russell v. North Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003).  Williams brings both an interference and a retaliation claim.

### a.    Interference

It is unlawful "for any employer to interfere with, restrain, or deny the exercise

of or the attempt to exercise, any right provided by the FMLA." 29 U.S.C. § 2615(a)(1); *see also Pereda v. Brookdale Senior Living Comm., Inc*., 666 F.3d 1269, 1273–74 (11th Cir. 2012). "To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit denied," *Strickland*, 239 F.3d at 1206–07, and that she "has been prejudiced by the violation in some way." *Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81, 89 (2002). Accordingly, for an interference claim, a plaintiff must establish two elements: (1) the employee was entitled to a benefit under the FMLA, and (2) her employer denied her that benefit. *Krutzig v. Pulte Home Corp*., 602 F.3d 1231, 1235 (11th Cir. 2010). For the following reasons, the court concludes there are disputes of fact preventing summary judgment on Williams' interference claim.

### i.    *Serious Health Condition*

An employee has the right to take FMLA leave for a variety of reasons, including (1) when the employee suffers from a "serious health condition" that makes her "unable to perform the functions of [her] position," *Hurley v. Kent of Naples, Inc*., 746 F.3d 1161, 1166 (11th Cir. 2014) (quotation omitted); and (2) so that the employee may "care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). A "serious health condition" is "an illness, injury,

impairment, or physical or mental condition that involves—(A) inpatient care . . . or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

As is relevant here, continuing treatment by a health care provider includes a period of "incapacity and treatment." 29 UC.F.R. § 825.115(a).

> A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>
> (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.115(a)(1)–(2).  Incapacity means the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

A serious health condition may be a chronic condition. 29 C.F.R. § 825.115(c).  The regulations define a chronic serious health condition as one that meets three requirements:

> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;
>
> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R.§ 825.115(c).

Williams contends that she, her son, and her father suffered from serious health conditions that would qualify her for FMLA leave.  Specifically, she argues that (1) her father had surgery, (2) "her son suffered from Giannotti-Crosti Syndrome and asthma," and (3) "she had vascular conditions, Type 2 Diabetes, and pelvic pain." Doc. 44-1 at 12.  Although she points to these three categories of conditions, Williams assumes, without any analysis of the evidence in the record, that they each qualify as serious health conditions.  Except potentially for her son's asthma, her assumptions are incorrect.  The court addresses each alleged serious health condition separately below.

Williams' father's surgery is a non-starter.  Williams' complaint does not provide any notice that Williams believed she was entitled to FMLA leave because of any issue related to her father. *See* Doc. 1.  The Eleventh Circuit does not permit a plaintiff to assert a new claim at the summary judgment stage. *Hulbert v. St. Mary's Health Care Syst. Inc*., 439 F.3d 1286, 1297 (11th Cir. 2006).  The "subsequent assertion of an additional, separate statutory basis for entitlement to leave . . . effects a fundamental change in the nature of [Williams'] interference claim." *Id*.  Because Williams did not move to amend her complaint, the court will not consider this

potential basis for FMLA leave.[23]

Williams' complaint did include minimal allegations about her own conditions, but there is insufficient evidence in the record to conclude that they qualify as serious health conditions under the FMLA. First, there is no evidence in the record about her diabetes and whether it would qualify as a chronic serious health condition. Second, as to her "pelvic pain," Williams testified that she had pain related to her menstrual cycles but could not recall her doctor's diagnosis (Doc. 43-1 at 62–63), and she references "female issues" throughout the record. To support this claim, there is one medical excuse in the record from her OB/GYN noting Williams should be off work June 29, 2022, through July 6, 2022, but it does not explain why she would need to miss work. Doc. 43-1 at 63; Doc. 43-2 at 40. In addition, merely missing work for one week does not suffice as a "period of incapacity." Instead, Williams must also show "treatment two or more times, within 30 days of the first day of incapacity." 29 C.F.R. § 115(a)(1). There is no evidence in the record of additional visits to her OB/GYN for the issue that required her to be off work that week. Simply put, Williams has not shown that her "pelvic pain" was

---

[23] Even if the court were to consider Williams' father's surgery, the record does not establish that it would qualify as a serious health condition. In fact, the court cannot find any evidence (and Williams does not point to any) of the reason for his surgery, whether it required him to remain in the hospital, or whether it affected his ability to work or perform regular daily activities. As best the court can tell, the only evidence in the record is a text from Williams to Woodall stating that he was having surgery and Williams would need to take one day off to help him complete his paperwork. *See* Doc. 43-9 at 35. Without more, the court cannot conclude that Williams presented sufficient evidence that her father's surgery could be considered a serious health condition.

a serious medical condition under the FMLA.

The same can be said of Williams' vascular issues. Williams testified that she had to get injections in her leg due to poor circulation. Doc. 43-1 at 91. The record appears to reflect that she scheduled her appointments before work and then went to work after the procedure. Doc. 43-1 at 15 & 91–92. But the FMLA requires a period of incapacity resulting in the "inability to work." 29 C.F.R. § 113(b). Williams' testimony that she was able to work after these procedures disqualifies her vascular issues as a serious health condition.[24]

Williams' son's asthma is another matter. As explained above, one type of serious health condition is a chronic health condition. *See* 29 C.F.R. § 825.115(c). Williams has a son whose asthma qualifies as a chronic serious health condition under the FMLA. It does not appear that RMR disputes this fact. Doc. 42 at 56 ("Other than her son's asthma, the plaintiff cannot establish that she or any of her children suffered from a serious health condition . . . ."). At any rate, there is ample evidence in the record showing at least two visits per year to the doctor over an extended period of time. And while it is not abundantly clear whether or not these episodes caused "incapacity," it does appear that at times his asthma met the definition.

---

[24] Even if any of Williams' conditions qualified as a serious health condition, there is no evidence that she provided proper notice to RMR that leave related to any of her conditions would qualify for FMLA leave. In fact, Williams admitted that she "didn't ask for FMLA on [her] behalf. I was asking it for my child . . . ." Doc. 43-1 at 15.

Williams' son's Giannotti-Crosti Syndrome, on the other hand, does not qualify as a serious health condition. Williams' son first developed the rash and received a diagnosis in March 2020. Doc. 43-20 at 7–8. There is no evidence in the record that he required any sort of periodic visits to a health care provider, much less two per year, after this initial diagnosis. To be sure, he developed another rash and another diagnosis as Giannotti-Crosti Syndrome in July 2022 (Doc. 43-2 at 47 & 73), but more than two years had passed since his last diagnosis. The diagnosis and treatment for a condition twice over a more-than-two-year period does not equate to a serious health condition. And even if it could be considered chronic, "the FMLA does not extend its potent protection to any leave that is medically beneficial leave simply because the employee has a chronic health condition." *Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1168 (11th Cir. 2014).

The court therefore concludes Williams has established that her son's asthma qualified as a serious chronic health condition under the FMLA. None of the other alleged conditions qualify as a matter of law. The court will consider only Williams' son's asthma in analyzing her interference and retaliation claims. *Russell*, 346 F.3d at 1340 ("Interference and retaliation claims both require the employee to establish a 'serious health condition'").

### ii.     *Notice of Need for FMLA Leave*

An employee must also give her employer notice of her need for leave, *see* 29

43

U.S.C. § 2612(e), and her an interference claim requires her to give proper notice. *Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1167 (11th Cir. 2014). When the need for leave is unforeseeable, as it was here, "the employee need only provide her employer with notice sufficient to make the employer aware that her absence is due to a potentially FMLA-qualifying reason." *Gay v. Gilman Paper Co*., 125 F.3d 1432, 1436 (11th Cir. 1997). An employee must give notice only once for the entire span of the intermittent leave. 29 C.F.R. § 825.302(a). The notice does not have to be in writing, and in fact the employee does not even have to mention the FMLA. 29 C.F.R. § 825.303(b). The "critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Gay*, 125 F.3d at 1435 (internal quotation marks omitted). After the employee does so, the burden shifts to the employer to inquire further into whether the leave implicates the FMLA. *Ragsdale*, 535 U.S. at 87; *see also* 29 C.F.R. § 825.302(c) ("In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken.").

"When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave

within five business days, absent extenuating circumstances." 29 C.F.R.
§ 825.300(b)(1). "An employee need not allege that his employer intended to deny
the right; the employer's motives are irrelevant." *Tanner v. Stryker Corp. of Mich.*,
104 F.4th 1278, 1290–91 (11th Cir. 2024) (citation omitted). And an employer's
failure to notify an employee about her right to take FMLA leave "may constitute an
interference with, restraint, or denial of the exercise of [her] FMLA rights." 29
C.F.R. § 825.300(e).

Williams meets the threshold requirements for notice of her son's asthma. On
at least three occasions, Williams asked about the potential for leave when her son
was sick: (1) she sent a June 8, 2021 email to Malone asking for "some kind of
documentation on record stating that my son is ill or has symptoms[25] that may require
me to take off when he becomes sick to protect my job" (Doc. 43-1 at 141); (2) after
the June 8 email, she spoke to Bill Woodall and asked if "he kn[e]w of a form that
[she] could have on file to protect [her] from . . . being off work with [her] kid," but
he "text[ed] her back and told [her that] he [did not] know of any form"[26] (Doc. 43-
1 at 34); and (3) she sent a November 21, 2021 text to Woodall stating that her "son
has asthma and a skin condition that may require [her] to be off work at any given

---

[25] Although she did not mention her son's asthma in this email, there are numerous times in the
record when Williams notified RMR that her son had asthma requiring treatment from a doctor.
[26] While this second inquiry might not alone provide adequate notice of the need for FMLA leave,
it is enough at summary judgment when combined with the November 21 text and Williams'
testimony that the employees at RMR generally knew her son was sick. Doc. 43-1 at 34.

moment" and asking whether there was a form she could "place on [her] file letting you all know that if I have to be off work at times like this." Doc. 43-9 at 37–38.

RMR's argument misses the mark by focusing on the medical records corresponding with the days she inquired about possible FMLA leave. *See* Doc. 54 at 30–32. There is no requirement that the request for FMLA leave coincide with an absence for a serious health condition. Instead, the only requirement is that "the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Gay*, 125 F.3d at 1435 (internal quotation marks omitted). Williams' inquiries about leave for her son's alleged illnesses suffice.

However, there is a question of fact as to how RMR responded to Williams' inquiries. Willliams claims that RMR either (1) did not respond; (2) told her they did not know of any other form she could place in the file; or (3) told her to turn in a doctor's excuse when she needed leave. Malone, however, testified that she spoke to Williams about the possibility of FMLA leave but she decided not to use it when he explained that it would be unpaid. Doc. 43-14 at 35–38. To be sure, the record is silent as to the substance of what Malone told her the FMLA provided. But this question of fact must be resolved by a jury.

### iii.    *Prejudice or Harm*

Even if there are questions of fact about whether RMR interfered with

Williams' rights under the FMLA, "a technical FMLA violation alone is not enough." *Ramji v. Hosp. Housekeeping Sys.*, LLC, 992 F.3d 1233, 1241 (11th Cir. 2021). Williams "must also 'demonstrate some harm' from the alleged interference, and that harm must be 'remediable by either "damages' or 'equitable relief.'" *Id.* (quoting *Evans v. Books-A-Million*, 762 F.3d 1288, 1296 (11th Cir. 2014) (in turn quoting *Ragsdale*, 535 U.S. at 89).

Williams argues that RMR's policy of requiring her to provide a doctor's excuse each time her son experienced an asthma attack or episode caused her harm.[27] Doc. 44-1 at 14. She explains that she "was made to take time out of her day to provide documentation to which the defendant was not entitled and in fact, forbidden from requesting outside of the recertification process." Doc. 44-1 at 14. The court agrees. There is "no question that wasted time is a concrete harm." *Losch v. Nationstar Mortgage, LLC*, 995 F.3d 937, 943 (11th Cir. 2021). In fact, Eleventh Circuit precedent "strongly suggests" the amount of time wasted can be little "more than a few seconds." *Salcedo v. Hanna*, 936 F.3d 1162, 1173 (11th Cir. 2019). For this reason, a reasonable jury could conclude that Williams has established that

---

[27] She also argues that after her termination, she "was denied a payout of her accrued vacation time." Doc. 44-1 at 15. This monetary loss was not a result of FMLA interference; it was caused by her termination. An employee's damages for a claim under FMLA must be a result of the employer's interference with rights guaranteed by the FMLA. *Graham v. St. Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999).

RMR's alleged interference caused her harm.[28]   Based on these findings, both motions for summary judgment on Williams' FMLA interference claim related to her son's asthma are due to be denied.

### b.   Retaliation

The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).   To establish an FMLA retaliation claim, an employee must show that his employer intentionally discriminated against him for exercising a right guaranteed under the FMLA. *Strickland*, 239 F.3d at 1207. Unlike an interference claim, an employee bringing a retaliation claim faces the increased burden of showing that his employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." *Id*. (quotations omitted).   Like discrimination claims, claims of retaliation can be supported with either direct or circumstantial evidence. *Lapham v. Walgreen Co*., 88 F.4th 879, 889 (11th Cir. 2023).

Williams contends that RMR retaliated against her when it disciplined and then terminated her employment because of absences that should have qualified for leave under the FMLA. Doc. 54 at 16.   She claims that she has presented both direct

---

[28] Williams also seeks equitable relief related to the FMLA interference claim in her complaint. Doc. 1 at 16.

and circumstantial evidence of retaliation.  "Direct evidence reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017) (internal quotation marks and citations omitted).  If believed, direct evidence "proves [the] existence of [a] fact without inference or presumption." *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)). "[D]irect evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor." *Rojas v. Florida*, 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002).

Williams points to the statements made by Valadao and Malone during her termination meeting as direct evidence of retaliation.  Specifically, she highlights the statements made by Valadao,[29] including (1) "I understand, I understand everything that's going on on the outside, but I have a business to run" (Doc. 50 at 5:54–6:00); (2) "There is nobody in this company that gets three Saturdays off in a row . . . You took Saturday off, the 25th, you were under a doctor's care on Saturday the 2nd, then you took Saturday off the 9th without getting it approved, and then yesterday you didn't come into work, is that correct?" (Doc. 50 at 8:42–9:00); and (3) he "can't run the business that way." Doc. 50 at 8:35–8:38.  She also points to

---

[29] Valadao made a few other similar comments during the meeting that the court does not quote here.  However, they all reflect the same sentiment—that he cannot run his business while accommodating Williams' excessive absences.

Malone's comment that there are "a lot of personal things that you are going through and we understand that, but we can't continue to go along this path because it's not productive for the company." Doc. 50 at 11:38–12:07.

None of these comments constitutes direct evidence of retaliation because they do not prove, without requiring an inference, that RMR discriminated against Williams based on the exercise of her FMLA rights. When viewing the termination meeting in context, it is clear that Valadao and Malone were not addressing only the absences that could have been FMLA-qualifying. Instead, the thrust of the meeting was that her pattern of missing work and being tardy could no longer be tolerated. Comments of this type require too large of an inferential leap to amount to direct evidence. *See Jones*, 854 F.3d at 1271 (finding that even comments which "might suggest but do not prove [the defendant's] discriminatory motive" are not direct evidence of FMLA retaliation).

Williams also claims that she can establish a circumstantial case of retaliation using the *McDonnell Douglas* framework.[30] To establish a *prima facie* case here, the plaintiff must show (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) the action "was casually related to the protected activity." *Martin v. Brevard County Pub. Schs.*, 543 F.3d 1261, 1268 (11th Cir.

---

[30] The court adheres to the guideposts recently announced in *Ismael*, 2025 WL 3492930, at *8–9, in analyzing her circumstantial case.

2008) (citing *Brungart v. BellSouth Telecomms., Inc*., 231 F.3d 791, 798 (11th Cir. 2000)).  If she meets these elements, an interference of retaliation arises and the burden shifts to her employer to give a "legitimate reason for the adverse action." *Hurlbert v. St. Mary's Health Care Sys., Inc*., 439 F.3d 1286, 1297 (11th Cir. 2006)). If the defendant offers a legitimate reason, the court then "proceed[s] to ask whether 'the record . . . presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional" retaliation. *Ismael*, 2025 WL 3492930, at *8.  If the plaintiff cannot establish a *prima facie* case, the court will "advance directly to the convincing mosaic inquiry" without the inference of illicit retaliation. *Id*. at *9.

As discussed above, a jury could find that Williams engaged in protected activity under the FMLA with respect to her son's serious chronic health condition of asthma.  She also suffered an adverse employment action when RMR terminated her employment.[31]  The problem for Williams, however, is that she cannot establish that her termination was causally related to her protected activity.  The proper causation standard for FMLA retaliation claims is "but-for" causation. *Lapha*, 88 F.4th 879 at 93–94.  This means that a plaintiff must "demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred." *Comcast*

---

[31] Although Williams states that RMR retaliated against her when it disciplined her (Doc. 44-1 at 10–11), she does not provide any analysis of her discipline as stand-alone adverse employment actions. Doc. 44-1 at 17–19; Doc. 58 at 55–56.  "It is not the job of the court to search through the record and make arguments for the parties." *Robinson v. RockTenn CP, LLC*, 986 F. Supp. 2d 1287, 1301 (N.D. Ala. 2013).

*Corp. v. Natl. Assoc. of African Am.-Owned Media*, 589 U.S. 327, 331 (2020);
*see also Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). "The but-for test
"directs [the court] to change one thing at a time and see if the outcome changes.' If
it does, the isolated factor is a but-for cause." *Lapham*, 88 F.4th at 894 (quoting
*Bostock*, 590 U.S. at 656).

RMR based Williams' termination on a number of absences—on June 25,
June 29, July 5, July 9, and July 13—as well as unspecified tardies over the same
period. Doc. 43-2 at 51. Williams argues that "there is not a single occasion of her
absence that is noted by Valadao for which Mrs. Williams does not offer a health-
related reason." Doc. 58 at 55–56. But the FMLA does not protect Williams from
retaliation for just any health-related reason; it must be one that is protected under
the statute. And, as discussed in detail above, the only serious health condition
protected by the FMLA is her son's asthma. None of these absences relates to his
asthma.[32]

Instead, taking the evidence in the light most favorable to Williams, the June
25, June 29, and July 5 absences related to Williams' stomach virus and then to her
gynecological issues. Doc. 43-1 at 62 & 64; Doc. 43-9 at 16; Doc. 43-2 at 40. There
is conflicting evidence related to the July 9 absence. When requesting the day off

---

[32] As best the court can tell, Williams' last absences potentially related to her son's asthma were
in April 2022. Doc. 43-2 at 12, 72, 78–79; *see also* Doc. 43-9 at 90–91. There is no evidence RMR
disciplined Williams for these absences or that they played any part in the reason for her
termination.

eight days before, Williams said only that she "need[ed] to be off July 9th." Doc. 43-2 at 42; Doc. 43-16 at 37.  However, after RMR denied the leave and Williams did not come into work, she texted that she "passed out from [her] procedure." Doc. 43-2 at 45.  Finally, the record is not clear why Williams failed to report to work on July 13, but it could have been related to an emergency room visit the night before due to her son's rash. *See* Doc. 43-2 at 46–47.  Because none of the absences that form the basis for her termination relate to a serious health condition, Williams has not established that illegal discrimination under the FMLA was the "but-for" cause of her termination.  Accordingly, she did not prove a *prima facie* case of retaliation.

Williams likewise has failed to present a convincing mosaic of retaliation under the FMLA.  Here, she points to the comments by Valadao and Malone during the termination meeting "that they understand she and her son have medical issues, but that they cannot continue in this way because it's 'not productive for the business.'" Doc. 58 at 56.  This argument is not persuasive since "not all leave requested or taken for medical reasons qualifies for the FMLA's protections." *Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000); *Hurley*, 746 F.3d at 1168 (explaining that the FMLA does not protect "any leave that is medically beneficial . . . simply because the employee has a chronic health condition").  There is simply no evidence before the court that Williams' termination had anything to do with leave that

potentially qualified under the FMLA. Summary judgment is due to be granted in favor of RMR on Williams' retaliation claim.

## IV. CONCLUSION

For these reasons, it is ORDERED as follows:

1.     Williams' Motion to Strike (Doc. 57) is GRANTED in part and DENIED in part.

2.     Williams' Motion for Partial Summary Judgment (Doc. 44) is DENIED.

3.     RMR's Motion for Summary Judgment (Doc. 42) is GRANTED in part and DENIED in part. The only claim that remains pending is Williams' FMLA interference claim based on her son's asthma.

DONE and ORDERED on January 30, 2026.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE